Below is a Memorandum Decision of the Court.

Chris M. Alston
U.S. Bankruptcy Judge
(Dated as of Entered on Docket date above)

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In re:

**Dara Parvin**,

      Debtor.

Case No. 15-12634-CMA

**OPINION RE MOTION BY THE UNITED STATES TRUSTEE FOR ORDER CONVERTING CHAPTER 7 CASE TO CHAPTER 11**

This matter came before the Court on the United States Trustee's motion for an order converting the Debtor's chapter 7 case to chapter 11 under 11 U.S.C. § 706(b) ("Motion to Convert").[1]  The United States Trustee ("UST") sought to convert the Debtor's chapter 7 case to chapter 11 on the ground that the Debtor had sufficient disposable income to repay his unsecured creditors through a chapter 11 plan.  The Debtor filed a response ("Opposition") to the Motion to Convert, arguing that forcing him to repay his

---

[1] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532; all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  The Federal Rules of Civil Procedure are referred to as "Civil Rules."

OPINION ON MOTION BY UNITED STATES TRUSTEE FOR ORDER CONVERTING CHAPTER 7 CASE TO CHAPTER 11 - 1

creditors through a chapter 11 plan was tantamount to forcing him to drudge for his creditors, which would constitute involuntary servitude in violation of the Thirteenth Amendment of the United States Constitution. The Debtor also contended that conversion of his chapter 7 case to chapter 11 would not be in the best interests of his creditors and, most particularly, himself. Shortly after the Debtor filed his Opposition, the UST filed a reply ("Reply") countering the Debtor's arguments.

The Court held a hearing on August 19, 2015. After hearing argument from both parties, the Court took the matter under advisement.

The Court has reviewed the Motion to Convert, the Opposition, the Reply, the parties' supporting legal memoranda, their declarations, evidentiary submissions and other supporting documents.[2] The Court also has taken judicial notice of all relevant entries on the docket of the Debtor's chapter 7 case for the purpose of ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; *In re Butts*, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006).

Based on that consideration and review, the Court will grant the Motion to Convert. Following are its findings of fact and conclusions of law under Civil Rule 52(a), applicable with respect to this contested matter under Rules 1017(f)(1), 7052 and 9014.

I. **FACTUAL BACKGROUND**

The facts in this matter are not in dispute. The Debtor commenced this case under chapter 7 on April 29, 2015. He filed his schedules and statement of financial affairs ("SOFA") on the same day. In his Schedule A, the Debtor indicates that he jointly owns a residence with the Parvin Family Trust. He discloses in his amended SOFA that, on January 6, 2015, he paid the Parvin Family Trust $60,443.20 "to increase share

---

[2] The Debtor filed a document titled, "Notice of Constitutional Challenge to 11 U.S.C. §§ 706(b), 1115(a)(2), 1127(e) and 1129(a)(15)" ("Notice"). In the notice, he asks that the Court certify to the appropriate attorney general that a statute has been questioned under Rule 9005.1 and Civil Rule 5.1. However, Civil Rule 5.1 applies only if the United States or one of its agencies is *not* a party to the proceeding. Here, the UST is a party and is an arm of the United States Department of Justice. Therefore, the Court need not certify the matter to the United States Attorney General.

OPINION ON MOTION BY UNITED STATES TRUSTEE FOR ORDER CONVERTING CHAPTER 7 CASE TO CHAPTER 11 - 2

ownership [in the residence] . . . from 20% to 38.72%." He also reports that he is paying the Parvin Family Trust $1,500 per month for the residence. The Debtor values the residence at $322,000 (which also was the purchase price for the residence). He lists no liens against the residence and claims a $125,000 homestead exemption in it.

Among his scheduled personal property assets, the Debtor has $44,369.14 in a "checking and/or savings account" located at a bank, $21,203.63 held in the trust account of his bankruptcy counsel, accounts receivable from his former private practice clinic, the Oregon Coast Spine Institute, in the amount of $101,241.86, a $3,000 security deposit with his parents, three Seahawks season tickets, with a combined value of $2,738, and a Seahawks Super Bowl ring, miscellaneous Seahawks collectibles, and "Seahawks gifts for kids" with a total value of $2,602.77. The Debtor asserts the value of his nonexempt assets is approximately $209,438.[3]

The Debtor reports in his schedules and in a later-filed declaration that he is an orthopedic surgeon, specializing in spine surgery. According to his amended SOFA, he earned $219,396.92 in 2015 (as of April 24, 2015), $203,229 in 2014 and $402,056 in 2013. The Debtor explains in his declaration that spine surgery is not going to be financially sustainable in this region. Consequently, he took a position at a hospital in Dubuque, Iowa, where he earns $62,499.99 in monthly gross income. The Debtor has an employment contract with the hospital that has guaranteed this salary for four years, and there are more than three years left on the employment contract. After taking payroll deductions and monthly rental income into account, he has $51,433.32 in monthly net income.[4]

The Debtor is unmarried and has no dependents. He has $16,946 in monthly expenses, which include $1,248 in home ownership expenses for his residence in Washington, $1,500 in rent for his apartment in Iowa, $2,000 for transportation and

---

[3] Opposition at 3. The chapter 7 trustee filed an objection to the Debtor's claimed exemptions, including his claim of exemption in the residence and the Seahawks season tickets.

[4] In his Schedule I, the Debtor notes that he will stop receiving rental income in May 2015. However, he has not yet filed an amended Schedule I to show that he no longer receives this monthly rental income.

OPINION ON MOTION BY UNITED STATES TRUSTEE FOR ORDER CONVERTING CHAPTER 7 CASE TO CHAPTER 11 - 3

$6,300 in child support. Based on his monthly net income and monthly expenses, the Debtor declares $34,487 in monthly net disposable income.

He lists $23,544 in secured debt and $1,094,648 in general unsecured debt.[5] $480,000 of this general unsecured debt arises from a personal loan from his parents, Dariush and Ann Parvin.[6] Aside from this debt, the bulk of the Debtor's general unsecured debt is business debt related to the Oregon Coast Spine Institute. He lists priority debt in an unknown amount owed for past and ongoing alimony and child support.

## II. JURISDICTION

This matter is a core proceeding under 28 U.S.C. §157(b)(2)(A). The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

## III. ANALYSIS

A. *Applicable law*

The Bankruptcy Code provides that, on request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time. 11 U.S.C. § 706(b). The burden is on the movant to show that the case should be converted. *In re Hardigan*, 490 B.R. 437, 445 (Bankr. S.D. Ga. 2013), *aff'd*, 517 B.R. 379 (S.D. Ga. 2014) (citing *In re Ryan*, 267 B.R. 635, 639 (Bankr. N.D. Iowa 2001)).

The Court has discretion to convert based on its determination of what will most inure to the benefit of all parties in interest. *Tex. Extrusion Corp. v. Lockheed Corp., (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1161 (5th Cir. 1988) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. at 380 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News

---

[5] In his original Schedule F, the Debtor reports $567,569 in general unsecured claims. In his first amended Schedule F, he discloses an additional general unsecured claim in the amount of $47,079.83. In his second amended Schedule F, he reports a general unsecured claim in the amount of $480,000.
[6] The Debtor states he had to borrow "around $475,000" from his parents when he was embroiled in various lawsuits related to the Oregon Coast Spine Institute. In his second amended Schedule F, he scheduled a debt to Dariush and Ann Parvin in the amount of $480,000 for "Personal Loans."

at 6336), *cert. denied*, 488 U.S. 926 (1988); *In re Schlehuber*, 489 B.R. 570, 573 (8th Cir. BAP 2013), *aff'd*, 558 Fed. Appx. 715 (8th Cir. 2014) (citing *In re Willis*, 345 B.R. 647, 654 (8th Cir. BAP 2006) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. at 380 (1977)). "Section 706(b) does not provide guidance regarding the factors a court should consider. Since there are no specific grounds for conversion, a court should consider anything relevant that would further the goals of the Bankruptcy Code." *Schlehuber*, 489 B.R. at 573, *quoting In re Gordon*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012) (internal citation and quotation marks omitted).

Courts have considered a variety of factors in deciding whether to convert a case from chapter 7 to chapter 11 under § 706(b). *Gordon*, 465 B.R. at 693. "Among the factors considered are whether the debtor can propose a confirmable plan, whether the primary purpose of the chapter 11 is to liquidate or reorganize, and whether conversion benefits all parties in the case." *In re Peterson*, 524 B.R. 808, 815 (Bankr. S.D. Ind. 2015), *citing Gordon*, 465 B.R. at 691-92. "A debtor's ability to pay typically is a starting point in the analysis, however, since the whole reason for asking [for] a case to be converted is the assumption that creditors would receive more in a chapter 11 than a chapter 7." *Peterson*, 524 B.R. at 815, *citing Gordon*, 465 B.R. at 693.

B. *The Parties' Arguments*

In its Motion to Convert, the UST urges the Court to convert the Debtor's chapter 7 case to chapter 11 because the Debtor has sufficient disposable income to fund a chapter 11 plan. Using his $34,387 monthly net disposable income to fund the chapter 11 plan, the Debtor can pay all of his general unsecured creditors in full in less than three years.

The UST further contends that conversion will not only benefit the Debtor's general unsecured creditors, but it will benefit the Debtor himself. The Debtor owes past due and ongoing alimony and child support in an unknown amount. Should his case be converted from chapter 7 to chapter 11, "the debtor will be able to satisfy all of his

outstanding domestic support obligations [based on his current income] and emerge from bankruptcy with a complete fresh start." Motion to Convert at 8. However, if he continues in chapter 7, the Debtor will not be able to obtain a "fresh start," as he cannot except these domestic support obligations from discharge under § 523(a)(5) and (15).

In his Opposition, the Debtor advances two main arguments, one challenging the constitutionality of conversion, the other focusing on the disadvantages of the conversion to his creditors and, primarily, to himself. The Court addresses the Debtor's contentions below.

1. *The Debtor's Constitutional Arguments Are Premature*

The Debtor opposes the UST's proposed conversion, arguing that forcing him to repay his creditors through a chapter 11 plan is the same as forcing him to enter peonage,[7] which violates the Thirteenth Amendment's prohibition against involuntary servitude.[8]

The Debtor's arguments are premature. Federal courts are limited to deciding cases and controversies under Article III of the Constitution. *Bova v. City of Medford*, 564 F.3d 1093, 1095 (9th Cir. 2009). "Two components of the Article III case and controversy requirement are standing and ripeness," which are closely related. *Id.* at 1095-06, *citing and quoting Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121, 1123 (9th Cir. 2009). The Debtor has neither constitutional nor prudential standing to challenge the constitutionality of the proposed conversion. The ripeness doctrine also precludes the Debtor's constitutional challenge to conversion.

---

[7] Peonage is defined as "[i]llegal and involuntary servitude in satisfaction of a debt." *Black's Law Dictionary* (10th ed. 2010), *available at* Westlaw BLACKS.

[8] The Thirteenth Amendment of the United States Constitution provides: "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

OPINION ON MOTION BY UNITED STATES TRUSTEE FOR ORDER CONVERTING CHAPTER 7 CASE TO CHAPTER 11 - 6

a) *The Debtor Lacks Standing*

"Standing is a threshold question in every case before a federal court." *McMichael v. Napa Cnty.*, 709 F.2d 1268, 1269 (9th Cir. 1983), *citing Warth v. Seldin*, 422 U.S. 490, 517-18, 95 S.Ct. 2197, 2214-15, 45 L.Ed. 2d 343 (1975). Standing is "'the question of . . . whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Ashley Creek Phosphate Co. v Norton*, 420 F.3d 934, 937 (9th Cir. 2005), *cert. denied*, 548 U.S. 903 (2006), *quoting Warth*, 422 U.S. at 498. The question of whether the litigant has standing involves both constitutional and prudential considerations. *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1108 (9th Cir. 2003) (citation omitted). "Together, the constitutional and prudential components of standing ensure that [litigants] possess 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Mink*, 322 F.3d at 1109, *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The constitutional component of standing requires that there be (1) an injury in fact (i.e., a concrete and particularized and actual or imminent harm to a legally protected interest), (2) a causal connection between the injury and the conduct complained of (i.e., the injury must be fairly traceable to the challenged conduct of the defendant), and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and quotations omitted). *See also Barnum Timber Co. v. E.P.A.*, 633 F.3d 894, 897 (9th Cir. 2011). This component focuses on the question of "'whether the litigant has alleged such a personal stake in the outcome of the controversy [as] to warrant his [or her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf.'" *Mink*, 322 F.3d at 1108, *quoting Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 260-61, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The Debtor fails to show that he has suffered an injury in fact. First, he does not have a legally protected interest that can be harmed by the conversion of his case from chapter 7 to chapter 11. The bankruptcy court in *Gordon* observed that a debtor has no right to be shielded from creditors under chapter 7:

> A party has a statutory right to file bankruptcy, but then only pursuant to the terms of the statute. If he does not want to comply with all the requirements of the Bankruptcy Code, he may not get a discharge. Refusing a debtor a discharge may have the practical effect of making a debtor address the debts *he incurred*. A creditor may seize property or garnish wages, but no one requires the debtor to work or places him in jail for failure to pay. The consequences he faces are those of his own creation – he will continue to owe his creditors.

465 B.R. at 700 (emphasis in original, footnote omitted).

Second, the Debtor does not stand to suffer the actual or imminent injury of involuntary servitude from the conversion of his case from chapter 7 to chapter 11 under § 706(b). Again, the Debtor will not be forced to work for anyone upon conversion:

> [T]he mere conversion of the case from chapter 7 to chapter 11 is not a type of physical or legal coercion constituting involuntary servitude. [In truth], conversion does not require anything of the Debtor. Conversion does not require the Debtor to work for a particular employer, or in a particular job, or to work at all, nor does it require the Debtor to pay his creditors. Conversion simply places the Debtor in another chapter within the Bankruptcy Code . . . .

*Gordon*, 465 B.R. at 699-700.

Here, the alleged injury of which the Debtor complains – that he will be forced to toil for his creditors by having to commit his postpetition income to a repayment plan under chapter 11 – has not occurred and may not occur. Given his substantial assets and the fact that his parents hold nearly half of his debt, the Debtor may be able to confirm a chapter 11 plan that does not require him to commit much or any of his income. And even if he is unable or unwilling to confirm a plan, he will not be legally compelled

to work for his creditors; rather, he may not receive a discharge as a consequence of not committing his future earnings. But at this point, the injury that the Debtor fears is speculative.

The Debtor also does not satisfy the prudential standing component. This requires that the litigant: (1) raise his or her own legal rights, rather those of third parties; (2) allege an injury that is more than a generalized grievance; and (3) allege an interest that is arguably within the zone of interests protected or regulated by the statute or constitutional guarantee in question. *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987) (citation omitted). This component bars the exercise of federal jurisdiction even when the constitutional component has been met. *Mink*, 322 F.3d at 1108.

The Debtor does not assert a right within the zone of interests protected by the Thirteenth Amendment. He has not shown that, as an individual debtor with primarily non-consumer debt seeking bankruptcy relief, he is within the class of persons intended to be benefited by the Thirteenth Amendment. The Thirteenth Amendment is intended to protect individuals from involuntary servitude situations "that are truly 'akin to African slavery.'" *Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 1000 (3d Cir. 1993), *cert. denied*, 510 U.S. 824 (1993). The Debtor thus lacks prudential standing to challenge the constitutionality of conversion.

b) *The Debtor's Constitutional Challenge Is Not Ripe*

The ripeness doctrine also bars the Debtor's constitutional challenge to the proposed conversion. Ripeness is "'peculiarly a question of timing.'" *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1143 (2001), *quoting Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). It "addresses *when* litigation may occur." *Bova*, 564 F.3d at 1096, *quoting Lee v. Oregon*, 107 F.3d 1382, 1387 (9th Cir. 1997) (internal quotation marks omitted, emphasis in original). The ripeness doctrine is

designed "'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Thomas*, 220 F.3d at 1138, *quoting Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

Like standing, ripeness has constitutional and prudential components. *Thomas*, 220 F.3d at 1138. The constitutional component of ripeness "coincides squarely with" the constitutional component of standing. *Id.* There must be (1) a constitutional case or controversy, and (2) concrete and definite issues. *Id.* at 1139, *quoting Ry. Mail Assn. v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945). To make sure these prerequisites are met, a court must consider whether the litigant "face[s] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" or "whether the alleged injury is too imaginary or speculative to support jurisdiction." *Thomas*, 220 F.3d at 1139, *quoting Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (internal quotation marks omitted).

The Debtor does not satisfy the constitutional component of ripeness. He theorizes that if he is forced to convert his chapter 7 case to chapter 11, he will be subjected to involuntary servitude in having to repay his creditors through a chapter 11 plan. But as noted above, this injury has not even occurred and may not occur. Such an injury is too speculative at this point, given that the Debtor has not yet proposed a chapter 11 plan.

Even if the Court concluded that the Debtor's constitutional challenge to conversion was constitutionally ripe, it is not prudentially ripe. The prudential component of ripeness requires a court to consider "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Thomas*, 220 F.3d at 1141, *quoting Abbott Labs.*, 387 U.S. at 149. The issue raised by the Debtor is not now fit for the Court's determination at this time because it assumes uncertain or unknown facts. The Debtor may need to commit some, most or all of his postpetition income in order to fund a repayment plan in chapter 11. However, this circumstance has not occurred and may not occur. The Court cannot review and determine this issue if the

underlying circumstances have not come to pass, and the Debtor will not suffer any hardship if the Court does not decide the issue at this time. *See Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996), *quoting Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1974) (determining that a federal court should not resolve issues "involv[ing] contingent future events that may not occur as anticipated, or indeed may not occur at all.").

2. *A Plain Reading of the Statute Authorizes Conversion*

In addition to his constitutional challenge, the Debtor briefly contends that the Court should interpret § 706(b) to preclude the conversion of his case to chapter 11 against his will. The Debtor notes that the Bankruptcy Code allows conversion to chapter 13 only if the Debtor requests or consents and that Congress prohibited involuntary chapter 13 cases due to Thirteenth Amendment concerns. 11 U.S.C. § 706(c); *Toibb v. Radloff*, 501 U.S. 157, 165-66, 111 S.Ct. 2197, 2201-02, 115 L.Ed.2d 145 (1991) (noting Congress's concern that an involuntary chapter 13 violates the Thirteenth Amendment's prohibition on involuntary servitude); *In re Fitzsimmons*, 20 B.R. 237, 240 (9th Cir. BAP 1982) (prohibition on involuntary conversion to chapter 13 reflects policy of the Bankruptcy Code to prevent involuntary submission to the bankruptcy estate of an individual's postpetition earnings which is consonant with the spirit of the Thirteenth Amendment). The Debtor contends the same concerns compel a prohibition on an involuntary conversion of an individual chapter 7 case to chapter 11, especially since Congress amended the Bankruptcy Code to include post-petition wages of an individual chapter 11 debtor in estate property. Opposition at 4.

The Court does not adopt the Debtor's interpretation of the statute. The Debtor is correct that with the enactment of Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109–8, 119 Stat. 23 (2005), an individual chapter 11 debtor's estate includes postpetition property and earnings, and, under certain conditions, an individual chapter 11 debtor may need to devote his or her

projected disposable income for five years to repay creditors. 11 U.S.C. §§ 1115(a) and 1129(a)(15). Congress also could have prohibited involuntary conversion of individual debtors to chapter 11 when it enacted BAPCPA, but did not and for good reason: the concerns raised by an involuntary chapter 13 case are not present upon a conversion to chapter 11. As the bankruptcy court in *Gordon* explained, the Bankruptcy Code does not require individual chapter 11 debtors to pay their earnings to creditors:

> The only effect of converting the case under Section 706(b) is that the Debtor's post-petition earnings become property of the estate, which means that, if he wishes to use those post-petition earnings for non-typical purposes, a request for approval to spend the money must be filed with the Bankruptcy Court and the use must be approved. 11 U.S.C. § 363. Conversion to a Chapter 11 also means the Debtor must file certain operating reports with the U.S. Trustee and pay a U.S. Trustee's fee. But this is all that happens upon the conversion of the case. This is different from a Chapter 13 case where, merely upon the filing of the case, the debtor is required to begin making payments and must immediately file a plan with a minimum length of three years.

465 B.R. at 697.

The plain language of § 706(b) authorizes the conversion of the Debtor's case to one under chapter 11. This is not an absurd result, and the Court will not read into the Bankruptcy Code a prohibition on conversion where none exists. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000) ("When the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.")(citations and internal quotation marks omitted).

*3. Conversion Serves the Interests of All Parties*

In his various arguments against conversion, the Debtor clearly advocates for his best interests. But the Court must consider the benefit to *all* parties in interest, not just

the Debtor.  *Tex. Extrusion Corp.*, 844 F.2d at 1161.  Here, given the record before the Court, the conversion may well benefit the Debtor and will benefit his creditors.

As noted above, the starting point for analysis under § 706(b) is the debtor's ability to pay.  *See Peterson*, 524 B.R. at 815.  *See also In re Decker*, – B.R. –, No. A14-00065-GS, 2015 WL 5027558, at *9 (Bankr. D. Alaska Mar. 31, 2015) (the ability to pay "is an exceedingly relevant, if not necessary, factor and the obvious starting point for any analysis under § 706(b).").  The Debtor contends that he will not have the ability to pay, based on numerous future and potential circumstances.  The Debtor concedes that he has substantial income now, but claims that he will not be able to maintain this level of income, given the limited term of his employment and the strenuous physical demands of his work.  By the time he confirms a chapter 11 plan, the Debtor notes he will have only three years of employment remaining under his employment contract.  He also projects that he has a limited number of earning years because he will be turning 50 years old in January 2016 and he will be unable to continue to physically perform his work.  The Debtor avers that the long hours and his own deteriorating health (he himself underwent spine surgery in July 2014) will affect his ability to maintain his current income.  He also risks early termination of his employment or a substantial reduction in his pay.

While some or all of these events may come to pass, at the moment and for the foreseeable future, the Debtor has more than sufficient income to fund a chapter 11 plan to repay his creditors.  His general unsecured claims total $1,094,648.  Assuming he is permitted to continue making all of the expenditures identified on his schedules, his monthly net disposable income is at least $34,487.  While he may be turning 50 years old soon, he is committed by his employment agreement to work—and to be paid handsomely—for the next three years.  Over that period of time, barring an unforeseen circumstance that would result in a substantial pay reduction or early termination, he will earn a total of $1,241,532 in net income, which is more than enough to pay his general unsecured claims (including the nearly half-million dollar obligation to his parents) in full.

And if he contributes his substantial personal property assets, he could repay his creditors in far less than three years.

The Debtor asserts that his general unsecured creditors stand to receive a substantial distribution if he remains a chapter 7 case. But in the next breath, he contends that a significant portion of these non-exempt assets (in particular, his accounts receivable) is not readily recoverable, which somewhat contradicts his initial proposition. He goes on to state that he will not be able to recover these assets as well or as effectively as a chapter 7 trustee can, claiming he neither has the time nor the expertise to pursue them with the same force and authority as the chapter 7 trustee. He also contends that continuing in chapter 7 would provide a benefit to general unsecured creditors by allowing them to write off the unpaid debts owed by him. If he proceeds in chapter 11, the general unsecured creditors cannot write off the debts and obtain tax deductions for these bad debts.

The Debtor's arguments do not convince the Court that remaining in chapter 7 is best for his creditors. Assuming a chapter 7 trustee could recover 100% of the value of the nonexempt assets, she or he would have approximately $200,000 to distribute to creditors who hold over $1 million in unsecured claims. While a 20% distribution in a chapter 7 case is meaningful, a 100% payout through a chapter 11 repayment plan is far better. And it would be the unusual creditor who would prefer to write-off a bad debt (which only provides a fractional benefit and only if the creditor has taxable income) rather than receive full payment of the debt. And as the debtor-in-possession under chapter 11, the Debtor will have the same powers and authority as a chapter 7 trustee.

The Debtor laments that a chapter 11 case will be financially and administratively burdensome on him. If required to proceed in chapter 11, he will incur substantial professional fees (e.g., attorney and accountant) and quarterly fees to the UST. He will have to file monthly financial reports and motions to approve the employment of professionals and the disposition of assets. He also will have to review claims and contest them if they are invalid or inaccurate. He then will have to establish and manage

a payment system for allowed claims. The Debtor further complains that he will become a fiduciary for his creditors and he will be restricted in his ability to use his assets and income.

The burdens identified by the Debtor are not too heavy to bear. These are the costs of administering a chapter 11 case established by the Bankruptcy Code, and debtors undertake these tasks all of the time. The Debtor has substantial disposable income, so he is in a better position than most debtors to afford these costs. The additional burdens on the Debtor are outweighed by the significant benefits that will conferred upon the other parties in this case. And conversion may well provide a benefit to the Debtor. In a chapter 11 case he can address and confirm a managed payment plan for his non-dischargeable domestic support obligations (which he currently reports as being in unknown amounts). *In re Baker*, 503 B.R. 751, 758-59 (Bankr. M.D. Fla. 2013) (conversion may enable the debtor to satisfy non-dischargeable debt owed to the IRS through the chapter 11 process which may not be possible in a chapter 7 case).

Based on the foregoing, the Court determines that the UST has borne its burden of proof to justify converting the Debtor's case from chapter 7 to chapter 11 under § 706(b). The Court therefore grants the UST's Motion to Convert. The Debtor's case will be converted from chapter 7 to chapter 11 under § 706(b) forthwith. The Court will enter a separate order consistent with its ruling.

///END OF OPINION///